546 So.2d 150 (1989)
Ernest WILLIAMS
v.
REGIONAL TRANSIT AUTHORITY and Transit Management of Southeast Louisiana
No. 89-C-0114.
Supreme Court of Louisiana.
June 19, 1989.
Rehearing Denied September 11, 1989.
*152 Roy Amedee, Jr., for applicant.
Emile Schneider, Kiefer, Kiefer & Schneider, Jerry Jordan, for respondent.
CALOGERO, Justice.[*]
Plaintiff, Ernest Williams, a streetcar operator in New Orleans, brought this claim for workmen's compensation benefits against his employer. Plaintiff alleged that as a result of being arrested at work and wrongfully accused of stealing streetcar fares, he developed a disabling mental injury (post traumatic stress syndrome) which has prevented him from working since the date of the arrest (March 6, 1986).
After trial on the merits, the district court ruled that plaintiff was entitled to worker's compensation benefits because "the arrest of Mr. Williams triggered a post traumatic stress disorder that he's currently suffering from and ...the arrest occurred during the course and scope of his employment." The trial court entered judgment in favor of plaintiff and against the employer for all past and future medical expenses incurred as the result of the mental disability, compensation benefits of $254.00 per week for "so long as his disability persists," statutory penalties of 12% on all past due compensation benefits, and $2,500 in attorney's fees. The court of appeal reversed, holding that "[i]t would be contrary to sound public policy to expand the worker's compensation statutes to include this type of incident." 534 So.2d 11 (La.App. 4th Cir.1988). We granted a writ to review the judgment of the court of appeal. 538 So.2d 600 (La.1989).
We now reverse the court of appeal judgment and reinstate the portion of the trial court's judgment awarding benefits and medical expenses to plaintiff. For the reasons set forth below, we find that plaintiff proved by a preponderance of the evidence that he was wrongfully accused of stealing funds from his employer, and that an injury-causing arrest based on such a wrongful accusation is a compensable accident that arises out of employment. We also find, for reasons considered at length in our opinion issued today in Sparks v. Tulane Medical Center Hospital and Clinic, 546 So.2d 138 (La.1989), that plaintiff's mental *153 injury was compensable even though it was not accompanied by physical trauma. However, we also hold that an award of statutory penalties and attorney's fess against the employer is not justified under the circumstances of this case.

FACTS

Events Leading to Plaintiff's Arrest
Prior to his arrest, plaintiff worked for eighteen years as a streetcar operator in New Orleans. At the time of the arrest, plaintiff was employed by Transit Management of Southeast Louisiana, Inc., which apparently operates the New Orleans streetcar line for the Regional Transit Authority (RTA).
The Transit Police Unit operates as a special division of the New Orleans Police Department (NOPD). NOPD officers assigned to the Transit Police Unit handle only those complaints related to the operation of the public transit system in New Orleans. Although officers assigned to the unit are employed by the City and supervised by NOPD officers, they work closely with the management of the Regional Transit Authority. In fact, the unit maintains an office at the RTA's facility on Canal Street.
In 1985, RTA's comptroller advised Sergeant Robert Gostl of the Transit Police Unit that revenues from streetcar fares had been declining, and that theft of fares by some streetcar operators was suspected. The RTA did not identify to police any particular streetcar operators suspected of theft, but merely conveyed its general suspicion that such theft could be the cause of revenue losses. As a result of RTA's complaint, the Transit Police Unit began to investigate the possibility that some streetcar operators were "pocketing" fares.
In February, 1985, Sgt. Gostl, riding on a streetcar while he was off-duty and in plain clothes, observed streetcar operator Joseph Magee pocketing fares as they were handed to him by riders. Magee was later arrested. Soon thereafter, Transit Police Unit officers arrested another streetcar operator, Herman Franklin, for stealing fares. Franklin was arrested after he was found to be in possession of marked bills that had been given him in payment of fares by undercover police officers posing as passengers on the streetcar.
After his arrest, Franklin confessed to stealing fares and told the police that he had observed plaintiff, Ernest Williams stealing fares on past occasions. Franklin also implicated Magee and another operator, Robert Mitchell. Acting on Franklin's allegations, police then "interviewed" Robert Mitchell. According to police, Mitchell confessed to stealing $250 in fares and also stated that he had seen plaintiff pocketing fares on prior occasions. Mitchell further stated that plaintiff had bragged to him about stealing fares.
Based on the allegations made by Franklin and Mitchell, transit unit police sought a warrant for plaintiff's arrest on the charge of "systematic theft of currency." After reviewing the sworn allegations of the police officers regarding the statements of Franklin and Mitchell, a criminal magistrate issued a warrant for plaintiff's arrest on March 6, 1986.
According to Sgt. Gostl, the transit unit police did not confer with RTA officials regarding the allegations against plaintiff prior to the issuance of the warrant for plaintiff's arrest. After the warrant was issued, police advised RTA's general manager of the charge against plaintiff. RTA indicated that it desired to press charges against plaintiff for theft, and arrangements were then made between police and RTA officials for plaintiff to be arrested at the end of his afternoon streetcar "run" (shift) on March 6, 1986.

Arrest, Interrogation and Detention
On March 6, plaintiff was assigned to operate a streetcar on the St. Charles Avenue line. At about 1:20 pm, as he neared the end of his shift, he brought his streetcar to the RTA facility near the corner of Willow and Carrollton. Earl Pradat, plaintiff's supervisor, boarded the streetcar and advised plaintiff that he was being relieved from duty and that the police wanted to speak with him. As plaintiff stepped off *154 the streetcar, he was arrested, handcuffed and taken to a waiting patrol car.
Plaintiff testified that once he was inside the patrol car, the arresting officers began badgering him and urging him to confess to having stolen fares so that he could avoid going to prison. Plaintiff also testified that the police tried to pressure him into giving them the names of other streetcar operators who had stolen fares. Plaintiff protested his innocence and said that he did not know of any other drivers who had stolen fares. The officers then took him to the Transit Police Unit office at the RTA facility on Canal Street, where, according to plaintiff, they questioned him for one or two hours and tried (unsuccessfully) to pressure him into admitting his guilt and implicating other employees. He was then taken to central lock-up, where he was booked, strip searched and placed in detention. Several hours later, his wife was able to post his bail and he was released from confinement.
The arresting officers denied that they attempted to harass or intimidate plaintiff in any fashion after the arrest. They acknowledged taking him to the Canal Street office for interrogation, but claim that they did so only because plaintiff indicated to them that he desired to make a voluntary statement. It was after plaintiff apparently changed his mind about making a statement, police said, that he was taken to central lock-up and booked.

Events Immediately Following the Arrest
The day after his arrest, plaintiff was instructed to attend a meeting with RTA officials. At that meeting, he was informed that he would be allowed to return to work because RTA "had nothing on him," and that he would be paid for any work he had missed as a result of his arrest and detention. However, plaintiff felt unable to work at that time because he was greatly upset over the events surrounding the arrest and had been unable to sleep the previous night. His supervisors told him that he could take off work until Monday of the following week.
Plaintiff returned to work the following Monday, but soon found himself unable to perform his normal employment duties. He testified that he still had not been sleeping well since the arrest and was very nervous. He was also bothered by the fact that co-employees and passengers on the streetcar who had seen the arrest kept asking him what had happened. Plaintiff worked for two days before leaving his job while in the middle of a streetcar run. He left work because he was extremely nervous and upset and could not operate the streetcar with his left arm shaking so badly. He had difficulty driving home from work that day and was crying as he did so. Plaintiff tried to resume work again the following week, but was unable to do so because he experienced the same problems (nervousness, shaking, anxiety). Subsequent to his second unsuccessful attempt to return to work, plaintiff has not worked for RTA or any other employer in any capacity.

Evidence Pertinent to the Criminal Charges
At trial, plaintiff denied that he ever stole fares or committed any other act of dishonesty during the eighteen year period that he worked as a streetcar operator.
Robert Mitchell, one of the two RTA employees who implicated plaintiff in a statement to police, testified at trial that his statement to police was false and was made under duress. Police told him that they would give him lenient treatment if he implicated plaintiff, so he did so. Mitchell denied ever having seen plaintiff stealing fares and denied that plaintiff had ever talked to him about stealing fares.
Herman Franklin, the other operator who made a statement to police implicating plaintiff, was not called as a witness at trial.
No court records were introduced regarding the disposition of the criminal charges made against plaintiff. The only evidence in the record regarding the disposition of those charges is plaintiff's testimony. Plaintiff testified that theft charges which were filed against him in *155 criminal district court at the time of his arrest were later dropped. Plaintiff stated that he was also charged with "conspiracy" in Orleans Parish municipal court in connection with the allegations that led to the arrest, and that he pled "no contest" to the municipal court charge, contrary to his personal preference but on the advice of his attorney (not the same attorney who represents him in this suit).[1]
Finally, we note that plaintiff presented certain testimony which was in the nature of character evidence. Certain witnesses testified that plaintiff had a good work record, had received a number of safety commendations, had not been involved in any previous trouble, had a reputation for honesty, and was relied upon by RTA to train new streetcar operator recruits because his supervisors thought so highly of his work.

Evidence Pertaining to Plaintiff's Injury
As noted above, plaintiff testified that he has been unable to return to work for any extended period of time since the arrest. At trial, he described his physical and mental state since the arrest as follows:
I was tired ... I just don't have no energy ... I didn't feel like eating, if I ate a little something ... I would throw it up sometimes.
. . . . .
I just lost interest in my family. I just didn't feel like being bothered and I couldn't sleep. I was having headaches. I be shaking. Right now sometimes my leg go to shaking, my arms are shaking and I had these headaches that I couldn't get rid of ...
. . . . .
I was just laying in the bed, I was saying how could something like this happen to me ... and I couldn't get rid of it ... I couldn't get it out of my mind. I tried all kinds of ways, I just couldn't get it out of my mind.
Dr. Chester Scrignar testified on plaintiff's behalf as an expert in the field of psychiatry. Dr. Scrignar first saw plaintiff for an interview on April 4, 1986. Plaintiff described the events of the arrest to Dr. Scrignar and complained of the symptoms and problems mentioned above. After two subsequent interview sessions with plaintiff, an interview with plaintiff's wife, and plaintiff's completion of a mental stress exam, Dr. Scrignar diagnosed plaintiff with "posttraumatic stress disorder with phobic anxiety related to the circumstances of the incident of March 6, 1986 [the arrest]."
Between April 4, 1986 and trial (September, 1987), Dr. Scrignar counselled plaintiff in thirty-four treatment sessions. Among the symptoms and problems which plaintiff exhibited or complained of during this period were intense anxiety, anger, nervousness, flashbacks of the arrest incident, headaches, rapid heartbeat, nightmares, obsession with the arrest incident and preoccupation with thoughts of death or serious bodily injury. Dr. Scrignar thought that these complaints evidenced post traumatic stress syndrome, and that an arrest of a person who was innocent of the charges against him was the type of traumatic incident which could trigger the syndrome.
Dr. Scrignar treated plaintiff with various forms of counselling and with anti-anxiety medication. The doctor was of the opinion that plaintiff had been unable to work since the arrest because of his mental condition, and that while his condition had *156 improved somewhat, he would be unable to work for the foreseeable future.
Dr. Richard Roniger was called as an expert in psychiatry by the defendant. Dr. Roniger examined plaintiff on one occasion, during a forty-five minute interview conducted on August 26, 1987. Based on observations made during this interview, Dr. Roniger expressed the view that plaintiff appeared to be in good health and was not suffering from any perceptible mental disorder. Dr. Roniger also testified that in his opinion, post traumatic stress syndrome can only be caused by an incident involving violence or a great threat of violence, such as a plane crash or wartime conditions faced by soldiers, and that the plaintiff's arrest was not the type of violent incident needed to trigger the disorder.
The trial judge apparently accepted the testimony of Dr. Scrignar over the testimony of Dr. Roniger, for she found that "the arrest of Mr. Williams triggered a post traumatic stress disorder that he's currently suffering from...." The court of appeal, which held that plaintiff is not entitled to recovery based upon its legal conclusion that injuries caused by an arrest are not compensable under the Act, did not reach the issue of whether plaintiff proved that he suffered a mental disability caused by the arrest.

ISSUES
We perceive that the major issues presented by this case are as follows:
(1) whether plaintiff's arrest constitutes an "accident" under the worker's compensation act;
(2) whether the type of injury alleged by plaintiff, that is, a mental injury caused by a significant employment incident but not accompanied by physical trauma, is compensable under the Act;
(3) whether, if such a mental injury may be compensable as a general proposition, this plaintiff proved by a preponderance of the evidence that he suffered such an injury, that the injury has prevented him from working and that the injury was caused by the arrest;
(4) whether the arrest was an event "arising out of" plaintiff's employment;
(5) whether the arrest occurred in the course of plaintiff's employment;
(6) whether, assuming that plaintiff is entitled to coverage, the employer should be assessed with statutory penalties and attorney's fees for failure to timely pay benefits.

DISCUSSION
Issue One: Was There An "Accident?"
The worker's compensation act provides coverage to any employee for "personal injury by accident arising out of and in the course of his employment." La.R.S. 23:1031. La.R.S. 23:1021(1) defines "accident" as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault, and producing at the time objective symptoms of an injury." We will discuss the "injury" requirement in our discussion of issues two and three, infra, and here focus on the requirement of "an unexpected or unforeseen event happening suddenly or violently."
The accidental event requirement has consistently been afforded a liberal interpretation by the courts of this state. Parks v. Insurance Co. of North America, 340 So.2d 276, 281 (La.1976). The question of whether there was an accidental event is viewed from the employee's perspective. Parks, supra; Ferguson v. HDE, Inc., 270 So.2d 867 (La.1972).
The arrest of an innocent person certainly qualifies as an unexpected and unforeseen event from the perspective of the arrestee. It is also fair to say that an arrest is generally a sudden event, which may or not be accompanied by violence (note that the statutory definition of accident is disjunctive in that it requires that the event happen "suddenly or violently," but does not require both elements). We conclude, then, that the arrest of an employee for a crime which the employee did not commit is an unexpected and sudden or violent event within the scope of the Act's definition of "accident."
*157 The plaintiff's essential allegation in this case is that he was arrested for a crime that he did not commit. Plaintiff's arrest was without question a sudden event, and if he was wrongly accused of the charged conduct (an issue considered and resolved in plaintiff's favor in our discussion of whether plaintiff's injury arose out of his employment, issue four, infra), then the arrest was also unforeseen and unexpected, and therefore accidental.
The court of appeal expressed the view that an "occurrence resulting from a police investigation or allegations of criminal activity is not a sudden or violent event as contemplated by the statute," and that "[i]t would be contrary to sound public policy to expand the worker's compensation statutes to include this type of incident." 534 So.2d at 11-12. While the court of appeal did not discuss the policy concerns which prompted its reversal of the trial court, it may be that those concerns relate not so much to whether an arrest may qualify as a sudden and unexpected event (a difficult point to dispute), but whether an injury caused by an arrest truly arises out of employment. This issue is discussed separately below. Here we simply make the initial determination that the arrest of an employee on charges of a crime that he did not commit qualifies as an unexpected and sudden event, an accident, under the statute.
Issue Two: Can There Be A Compensable Injury Despite the Absence of Physical Trauma?
As noted above, the Act's definition of "accident" requires that the unexpected and sudden or violent event "produce at the time objective symptoms of an injury...." The Act defines "injury" and "personal injuries" as "injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom." La.R.S. 23:1021(7).
In a separate opinion issued this date, Sparks v. Tulane Medical Center Hospital and Clinic, 546 So.2d 138 (La.1989), we have determined that "a mental injury induced by mental stress that is caused by an unexpected and sudden or violent employment-related event may be compensable under the Act." Sparks, 546 So.2d at 147. Accord Jones v. City of New Orleans, 514 So.2d 611 (La.App. 4th Cir.1987), writ denied, 515 So.2d 1111 (La.1987); Taquino v. Sears, Roebuck & Co., 438 So.2d 625 (La. App. 4th Cir.1983), writ denied, 443 So.2d 597 (La.1983). It is not a requirement of coverage that the mental injury be accompanied by physiological damage or a physical blow or trauma. However, an employee may not recover for mental stress or injury related to "general conditions of employment." Sparks, supra, 546 So.2d at 147 (emphasis in opinion). The employee must prove that the mental injury was "precipitated by an accident, i.e., an unexpected and unforeseen event which occurs suddenly or violently." Id.[2]
Issue Three: Did the Plaintiff Prove That He Suffered An Injury, That the Injury Prevented Him From Working, and That the Injury Was Caused by the Arrest?
As earlier noted, the trial judge, faced with conflicting expert testimony, found that the plaintiff suffered a disabling mental condition (post traumatic stress syndrome) which was caused by the arrest. In so finding, the trial court implicitly accepted the testimony of Dr. Scrignar and rejected the testimony of Dr. Roniger.
It is well established that the trial judge has considerable discretion in accepting or rejecting expert testimony, and that the trial judge's decision to accept the testimony of one expert over another should not be disturbed absent manifest error. Middle Tennessee Council, Inc., Boy Scouts of America v. Ford, 274 So.2d 173 (La.1973); Dubois v. State through Dept. of Public Safety, 466 So.2d 1381 (La.App. 3rd Cir.1985).
*158 On the other hand, in view of the sometimes nebulous characteristics of mental injuries and the possibility of symptoms being feigned, utmost care should be exercised in determining whether the employee proved that he suffered such an injury and proved that the injury was causally related to his employment. Westley v. Land & Offshore, 523 So.2d 812, 813 (La.1988); Andrus v. Rimmer & Garrett, Inc., 316 So.2d 433, 436 (La.App. 3rd Cir.1975). See also Malone & Johnson, 13 La.Civil Law Treatise, Worker's Compensation § 235.[3] While affording due deference to the trial court's resolution of this issue, we have also independently reviewed the conflicting medical testimony and other testimony pertinent to plaintiff's injury.
Dr. Scrignar, an expert with strong credentials in the psychiatric field (including four current academic appointments; four hospital affiliations; a position as consultant to the New Orleans Police Department and numerous other organizations; and thirty-two publications, including a recent book on post traumatic stress syndrome), gave detailed testimony in support of his finding that plaintiff is suffering from a post traumatic stress disorder. He described this mental disorder as a condition which is triggered by a traumatic event and which causes plaintiff to relive the events surrounding the accident and to suffer from the numerous symptoms and problems earlier discussed (including headaches, nausea, shaking, depression and anxiety).[4] Dr. Scrignar also explained methods that he used in order to be certain that plaintiff's complaints were sincere. While Dr. Roniger expressed the view that post traumatic stress syndrome cannot be triggered by an event which does not involve violence or a great fear of violence, Dr. Scrignar supported his own contrary view that the syndrome can be caused by non-violent but extremely traumatic events, such as the arrest in this case, with a reference to a psychiatric text, the Diagnostic and Statistical Manual on Mental Disorders (Rev. 3d Ed., 1987). Finally, whereas Dr. Scrignar observed plaintiff over the course of thirty-four treatment sessions from April, 1986 to September, 1987, Dr. Roniger saw plaintiff on only one occasion, in August, 1987. Considering these factors, we cannot say that the trial court was wrong in accepting the testimony of Dr. Scrignar rather than the testimony of Dr. Roniger.
Medical testimony aside, we note that plaintiff worked eighteen years as a streetcar operator prior to the arrest, during which time he had an excellent work record and was fully able to perform his employment duties. He had no history of physical or mental problems prior to the arrest. After the arrest, he made two unsuccessful efforts to return to work. There is no evidence in this record which suggests that plaintiff walked away from a job that he had performed for eighteen years in order to feign an injury so that he could receive worker's compensation benefits. To the contrary, the evidence supports the trial court's finding that plaintiff suffered a disabling mental injury as the result of the arrest.
Issue Four: Did the Arrest "Arise out of" Plaintiff's Employment?
Under La.R.S. 23:1031, the employee's injury must arise out of his employment. The purpose of the "arising out of" requirement is to assure that compensation *159 will be awarded only for those personal injuries related to risks incidental to employment. Reid v. Gamb, 509 So.2d 995 (La.1987); Nix v. City of Houma, 488 So.2d 184 (La.1986); Malone & Johnson, supra, § 191. The "arising out of" inquiry focuses upon whether the character or origin of the risk giving rise to injury was employment related. Raybol v. Louisiana State University, 520 So.2d 724 (La.1988).
The somewhat unusual issue presented by this case is whether there are any circumstances under which the risk that an employee will suffer injury as the result of being arrested in the course of his employment can be said to "arise out of" employment. As far as we can determine, this issue has not previously been addressed in a suit for worker's compensation benefits.[5]
There are two obvious circumstances under which an arrest and any resulting injury cannot be said to arise out of employment. The first circumstance is when the arrest is made by public authorities on charges wholly unrelated to the employee's job. For example, a carpenter arrested at work on charges of allegedly committing a bank robbery the previous night would be in no position to claim that the risk of arrest (and any resulting injury) on that charge arose out of employment. Compensation would not be available in such a case, regardless of the fact that the employee may have been innocent of the crime charged, because the risk leading to injury was in no way related to employment.
The second circumstance in which the risk of arrest does not arise out of employment occurs when the charges are employment related (e.g., theft of the employer's funds) but the employee is in fact guilty of the charged misconduct. The risk of injury created by an employee's own criminal conduct is not the type of risk that can be fairly assigned to the employment. Even if employment conditions create or provide an opportunity for an employee to engage in criminal conduct, the employee's anti-employer criminal violation cannot be said to arise out of the employment. Thus, the risk that the employee will be injured while engaging in criminal conduct is purely personal to the employee and his non-employment related conduct.[6] It might also be said that an employee who commits criminal conduct deviates from the course of his employment. See, e.g., Broussard v. Farm Storage & Equipment, Inc., 236 So.2d 882 (La.App. 3rd Cir.1970) (coverage denied for employee who was injured while attempting to steal property from his employer).
Thus, when an arrest results from an employee's criminal conduct, the risk of a resulting injury does not arise out of employment.
Perhaps the policy concern which prompted the court of appeal to hold that injuries caused by an arrest cannot ever be compensable was the fear that if such injuries were found to be compensable, some employees might be allowed to recover for injuries brought about by their own criminal conduct. As we have indicated, such injuries are not compensable because they *160 do not arise out of employment. However, we believe the court of appeal's holding that there are no circumstances under which injuries caused by an arrest may be compensable under the Act sweeps too broadly, for there is a third circumstance, distinguishable from the two situations discussed above, in which the risk of arrest and resulting injury do indeed arise out of employment.
If an employee is arrested and wrongfully charged with an offense related to his employment (e.g., theft of employer's property), then he should have a compensation remedy against his employer for any injury sustained in the arrest. The risk that an employee who has been given responsibility for handling the employer's funds or property will be wrongfully accused of stealing that property is clearly a risk that arises from employment.
We emphasize that the availability of a compensation remedy in such a case is premised on the fact that the injury was caused by a risk of employment, and not on whether the arrest was lawful or whether the employer was negligent in bringing charges which led to the arrest. Unlike a tort action for false arrest or malicious prosecution, where the initial focus is upon whether or not the criminal charges are supported by probable cause, see, e.g., Miller v. East Baton Rouge Parish Sheriff's Dept., 511 So.2d 446 (La.1987), the initial focus in a worker's compensation action should be on whether the employee was wrongly accused. For even if the arresting authority (be it the employer or a public authority or both) had probable cause to arrest, the employee should be compensated for any resulting injury if it is determined that he was not guilty of the charged conduct. In that case, as in any worker's compensation case, the employer's responsibility to pay benefits is not based on fault, but on the fact that an employee suffered an injury stemming from an employment risk.
Because it is the employee's initial burden to prove an injury by accident arising out of and in the course of employment, the employee has the burden of proving that he did not commit any criminal conduct which led to the arrest. The employer may then attempt to rebut evidence presented by the employee on that issue through any evidence which tends to prove the employee's guilt.[7]
In this case, the factors pertinent to plaintiff's guilt or innocence regarding the accusations against him (stealing streetcar fares) was as follows:
(1) plaintiff's testimony that he did not commit the charged conduct;
(2) certain character evidence in plaintiff's favor;
(3) plaintiff's plea of nolo contendere in municipal court to an unspecified charge that was apparently related to the charges which led to his arrest;
(4) two out-of-court statements by RTA employees alleging that plaintiff had stolen fares, one by an employee who repudiated his statement at trial and the other by an employee who did not testify at trial.
Of the above, factors one and two are in the plaintiff's favor. Factor three, the nolo contendere plea, is not detrimental to plaintiff, because such a plea does not constitute evidence of guilt in a civil proceeding. LSBA v. Connolly, 206 La. 883, 20 So.2d 168 (1944); State v. Brown, 490 So.2d 601, 602 (La.App. 2nd Cir.1986). Nor have we even been informed, in this case, of the precise charge to which plaintiff entered the plea. See supra, footnote one.
The sole remaining evidence on the guilt issue consisted of the out-of-court statements (introduced without objection through the testimony of the arresting officers) by the two co-employees, Mitchell and *161 Franklin (factor four, above). The truthfulness of both of these statements is questionable at best. Mitchell repudiated his earlier incriminating statement about plaintiff, and Franklin was not called as a witness at trial. No witness was presented at trial who could testify from personal knowledge that plaintiff had engaged in illegal activity, and no independent evidence was presented to corroborate the out-of-court statements by Mitchell and Franklin.
In summary, plaintiff's testimony that he did not commit the crime for which he was arrested was not rebutted by any reliable evidence. Because plaintiff proved by a preponderance of the evidence that he was not guilty of any criminal conduct leading to his arrest, and because the charges underlying the arrest were plainly employment-related, the injury which plaintiff sustained from the arrest arose out of his employment.
Issue Five: Did the Injury Occur in the Course of Plaintiff's Employment?
Closely related to the "arising out of" employment issue is the requirement that the employee's injury occur in the course of employment. An injury occurs in the course of employment when it happens during the time of employment and at a place contemplated by employment. Michaleski v. Western Preferred Casualty Co., 472 So.2d 18 (La.1985); Lisonbee v. Chicago Mill & Lumber Co., 278 So.2d 5 (La.1973). The requirement that the employee's injury must occur in the course of employment focuses upon "the time and place relationship between the risk and the employment." Raybol v. Louisiana State University, supra, 520 So.2d at 724.
Defendant argues that plaintiff had completed his shift of duty just prior to the arrest, and that therefore the arrest and any resulting injury did not occur in the course of employment. However, plaintiff testified that on the day of the arrest he was scheduled to work "extra board" duty, which meant that at the conclusion of his streetcar operation shift, he would report to RTA's office to determine whether he was to be assigned an additional shift of duty later that day. This testimony was not contradicted by anyone from RTA. It is apparent, then, that the arrest occurred while plaintiff was still on duty, and not as he was leaving his job to go home. Under these circumstances, the arrest occurred in the course of plaintiff's employment.
Issue Six: Penalties and Attorney's Fees
In addition to awarding plaintiff compensation benefits and medical expenses, the trial judge assessed statutory penalties and attorney's fees against the employer under the provisions of La.R.S. 23:1201 & 23:1201.2 (statutory penalties consisting of a 12% interest assessment on all past due benefits and a $2,500 award for attorney fees). The defendant argues in brief that even if a finding of coverage were appropriate, it should not be forced to pay penalties and attorney fees because of the "novel" coverage issues presented by this case.
La.R.S. 23:1201(B) provides that the first installment of compensation benefits shall become due the fourteenth day after the employer has knowledge of the injury giving rise to disability. La.R.S. 23:1201(E) further provides that if an installment of benefits is not timely paid within the 14 day period, "there shall be added to such unpaid installment a penalty of ... twelve percent thereof ... unless such nonpayment results from conditions over which the employer or insurer had no control," or unless "the employee's right to such benefits has been reasonably controverted by the employer...."
R.S. 23:1201.2 provides that if the employer does not pay the employee's claim within sixty days of receipt of written notice thereof, then the employer shall be liable for payment of the employee's attorney's fees if its failure to make timely payment "is found to be arbitrary, capricious or without probable cause."
In this case, it is undisputed that the employer, upon receiving written notice of plaintiff's disability from Dr. Scrignar, did not pay benefits within the aforementioned statutory time periods. However, because this case involved an unusual coverage issue *162 not conclusively resolved by the jurisprudence at the time that the claim was made,[8] we cannot say that the employer's decision to contest coverage was unreasonable. The defendant therefore had reasonable grounds to controvert plaintiff's claim and does not owe statutory penalties under § 23:1201. See Breaux v. Travelers Ins. Co., 526 So.2d 284 (La.App. 3rd Cir.1988). Similarly, the employer is not liable for attorney's fees because its denial of coverage was not arbitrary and capricious under § 23:1201.2. See Freeman v. Brown's Furniture of Bunkie, Inc., 527 So.2d 544 (La.App. 3rd Cir.1988). Accordingly, we hold that the trial court erred in assessing statutory penalties and attorney's fees against the defendant.

DECREE
The judgment of the court of appeal is reversed. The trial court's judgment is reinstated, but only insofar as that judgment awarded plaintiff worker's compensation benefits, past due medical expenses and all future medical expenses.
COURT OF APPEAL JUDGMENT REVERSED; TRIAL COURT JUDGMENT REINSTATED IN PART.
HALL, J., dissents and assigns reasons.
COLE, J., dissents for reasons assigned by HALL, J., in No. 89-C-0077, also decided this day.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
I respectfully dissent for the reasons expressed in my dissent in Sparks v. Tulane Medical Center Hospital and Clinic, 546 So.2d 138, also decided this day.
HALL, Justice Pro Tem., (dissenting).
I respectfully dissent for the reason expressed in my dissent in Sparks v. Tulane Medical Center Hospital and Clinic, 546 So.2d 138 (La.1989), also decided this day.
NOTES
[*] Judge Pike Hall, Jr., justice pro tempore, participated in this case in place of Harry T. Lemmon, Justice.
[1] Plaintiff's attorney represented at oral argument that he learned after trial that the municipal court charges against plaintiff may in fact have been dismissed nolle prosequi, and that plaintiff's former lawyer had mistakenly told plaintiff that the charges had been disposed of on a "no contest" plea. This Court allowed counsel leave to supplement the record with any records from the municipal court which document the disposition of the charge against plaintiff, but we have since been advised by plaintiff's counsel that the court records regarding plaintiff's case cannot be located. Thus, we must assume on the basis of the record before us that plaintiff entered a plea of nolo contendere to a charge relating to the allegations which led to his arrest, although the exact charge (which plaintiff referred to simply as "conspiracy") is unclear. As noted below under our discussion of issue four, infra, the nolo contendere plea has no evidentiary effect in this civil proceeding.
[2] As also discussed in Sparks v. Tulane Medical Center Hospital and Clinic, supra, the statutory requirement that the accident must "produce at the time objective symptoms of injury" has been liberally construed by our jurisprudence, such that an injury is compensable upon "a showing that the accidental event produces some symptoms of a discernible injury at a point in time sufficient to permit the conclusion that the injury was causally related to employment." Id., 546 So.2d at 146 n. 5.
[3] "[I]t should be recognized that our own knowledge of mental consequences of injury is less sophisticated than our knowledge of physical consequences. As a result, it is often very difficult to distinguish between the employee who is genuinely disabled due to mental conditions and the malingering employee. And it is just as important that we deny compensation to the latter as it is that we compensate the former." Malone & Johnson, supra, § 235 at p. 508.
[4] Post traumatic stress syndrome has been recognized in a number of cases as a medically verifiable mental disorder, and compensation has been awarded to employees who were disabled by the syndrome as the result of a work-related accident. See, e.g., Westley v. Land & Offshore, 523 So.2d 812 (La.1988); Jones v. City of New Orleans, 514 So.2d 611 (La.App. 4th Cir.1987), writ denied, 515 So.2d 1111 (La.1987); Miller v. USF & G, 478 So.2d 200 (La.App. 3rd Cir.1985).
[5] There are reported decisions of course which hold than an employee has a tort remedy against his employer when the employer precipitates or participates in the wrongful arrest of the employee. See, e.g., Skelton v. W.T. Grant Co., 331 F.2d 593 (5th Cir.1964) (applying Georgia law); see also, Annot., Workmen's Compensation Provision as Precluding Employee's Action Against Employer for Fraud, False Imprisonment, Defamation and the Like, 46 A.L.R.3d 1279 § 4 (1972). Such cases, however, simply hold that the employee may bring a tort action for false arrest because worker's compensation was not the exclusive remedy for the employee's injury. They do not address whether the employee could have opted to sue the employer for worker's compensation benefits.
[6] Our discussion regarding criminal conduct refers only to situations where the employee deliberately oversteps the boundaries of his employment by committing a crime, and not to an employee's mere act of violating a civil or criminal statute while attempting to perform legitimate employment duties, e.g., speeding while operating a motor vehicle in the course of employment. In the latter case, the violation of the law is incidental to the negligence of the employee in attempting to perform his employment duties, and any resulting injury arises out of employment. See Larson, 1A Workmen's Compensation Law §§ 31 & 35.
[7] The described allocation of proof is similar to the standards imposed in a tort action for false arrest, wherein the plaintiff has the initial burden of proving that there was no probable cause or lawful authority for the arrest, see, e.g., O'Conner v. Hammond Police Dept., 439 So.2d 558 (La.App. 1st Cir.1983), the difference being, as discussed above, that in a worker's compensation action the employee is entitled to benefits even if there was a lawful arrest, if the employee shows that he was not guilty of the charges leading to the arrest.
[8] As previously observed, we are unaware of any reported case which addresses whether injury caused by an arrest is compensable under the worker's compensation statute, and if so, under what circumstances. Furthermore, prior to our decision today in Sparks v. Tulane Medical Center and Clinic, supra, there was a conflict among the circuit courts of appeal in this state on the issue of whether a mental injury unaccompanied by physical trauma was compensable under the Act.